# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN ALLEN BENNETT, | Case No. 1:12-cv-01838-AWI-SAB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| GERALD JANDA, et. al, | (ECF No. 1) |
| Respondents. | |

Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by Jeralyn K. Keller, Esq.

## I.

## BACKGROUND[1]

Following a jury trial in the Kern County Superior Court, Petitioner was convicted of two counts of forcible rape and forcible oral copulation of Ms. M (Cal. Penal Code[2] §§ 261, subd. (a)(2), 288a, subd. (c)(2)); six counts involving two counts of forcible rape, forcible oral copulation, and forcible sexual penetration against Ms. B (§ 289, subd. (a)(1); two counts of

---

[1] This information is taken from the state court documents lodged by Respondent on February 1, 2013.

[2] All further statutory references are to the California Penal Code unless otherwise indicated.

1

kidnapping with the intent to commit rape of Ms. A and Ms. B (§ 209, subd. (b)(1); and two counts of second degree robbery of Ms. A and Ms. B (§ 212.5, subd. (c)). It was also found true that during the kidnappings Petitioner substantially increased the risk of harm (§ 667.61, subd. (e)(1)), and used a deadly or dangerous weapon (former § 667.61, subd. (e)(4)[3]).

On June 22, 2009, Petitioner was sentenced to a total indeterminate term of 200-years-to-life, plus a determinant term of seven years, four months. (RT 1368.)

Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate District. On May 16, 2011, the California Court of Appeal affirmed the judgment in all respects.

On August 10, 2011, the California Supreme Court denied review.

Petitioner filed the instant federal petition for writ of habeas corpus on November 5, 2012, in the United States District Court for the Southern District of California. On November 9, 2012, the petition was transferred to this Court.

Respondent filed an answer to the petition on January 25, 2013, and Petitioner filed a traverse on February 22, 2013.

## II

## STATEMENT OF FACTS[4]

On October 25, 2006, [Ms. M.] contacted the Bakersfield police and reported that she had just been kidnapped by a man in a car and raped by him. She described the rapist and the car and said the car's license plate began with 5VUA.

Erica B. contacted the Bakersfield police on December 16, 2006, and reported that she, too, had just been kidnapped by a man in a car and raped by him. She described the rapist and the car.

---

[3] This provision is now codified at section 667.61, subdivision (e)(3).

[4] This statement of facts is taken from the appellate court's May 16, 2011, decision which is presumed correct. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

2

The police presented photographic lineups to both victims on December 26, 2006. The first set of photos shown to [Ms. M.] included [Petitioner], but Ms. M. failed to identify him. The officers who prepared the lineups concluded that the photo of [Petitioner] they had used was not a good likeness. They substituted another photograph of him and prepared a second lineup. Ms. M. identified [Petitioner] in the second lineup. She pointed to his picture immediately and said, "'Oh, my god, that's him.'" [Ms. B.] was shown only the second lineup. She immediately identified [Petitioner]. The identifications led to [Petitioner's] arrest.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

At trial, [Ms. M.] testified that, at about 11:00 a.m. on October 25, 2006, she was walking to a bus stop to go to work. She was then 18 years old. A car she described as a blue four-door Alero with 20-inch chrome rims and a khaki or gray interior went by twice. [FN.4] When it came by a third time, the driver offered her a ride. She declined. He drove up close to her, opened the door and forcibly pulled her inside. The driver, whom Ms. M. identified at trial as [Petitioner], was a White man with ash blond hair, light-colored eyes, and tattoos on his hands. He was wearing a khaki and blue jacket and smoking Marlboro cigarettes. His hands were dirty, "like he had barely gotten off of work or something." He told Ms. M. his name was Steven, he lived in Oildale, and he worked in the oil fields. He told her his hobby was either cars or planes, she could not remember which one. He repeatedly said things like, "'There's a lot of crazy white guys.'"

[FN.4] Ms. M. also testified that the car was a Ford and that she saw "Ford" on the steering wheel. As will be seen, [Petitioner's] car was a blue Oldsmobile Alero.

As he was driving, the assailant produced a seven-inch knife with a gold-colored handle. He ordered her to pull her pants down. She pulled them part of the way down. While still driving, he put his hand in her pants. Then, saying "'[l]et's take a visit to grandmother's house,'" he drove into Union Cemetery. He stopped at the back of the cemetery, removed the tampon Ms. M. was wearing, reclined the passenger seat in which Ms. M. was sitting, climbed on top of her, held her down, and raped her. He continued to hold the knife at her side and repeatedly told her to call him "poppy." Ms. M. did not know whether he ejaculated. Next, the assailant got out of the car and forced Ms. M. to copulate him orally as she continued to sit in the passenger seat.

The assailant got back in the car and started driving. While doing so, he examined the contents of Ms. M.'s purse, asking whether she had anything with her address on it. She said no. He found money and took it, saying, "'You're actually paying for me to do this to you.'"

He stopped near San Joaquin Hospital and said, "'Give me a kiss so that way it won't seem strange or weird.'" He kissed her on her cheek and let her leave. She wrote part of the car's license plate number on a piece of paper with an eyeliner. A bystander helped her call home and contact the police.

3

A police officer took Ms. M. to Kern Medical Center, where she was examined by a sexual assault nurse examiner. The examination included the swabbing of Ms. M.'s face for DNA, because of the kiss. Another officer later took Ms. M. to a car dealer to look for a car of the same model as the assailant's car. Ms. M. told the officer the car was an Oldsmobile Alero. She pointed out a 2002 Pontiac Grand Prix and said it looked very similar to the car in which she was kidnapped. The Alero and the Grand Prix are General Motors cars that share a single design.

[Ms. B.] testified that she was walking home from a bus stop at about 5:00 p.m. on December 16, 2006. She was 18 years old. It was dark and raining. A car pulled up and the man inside asked her if she wanted a ride. Thinking she recognized him, she got in.

Once inside, she realized she did not know the man, whom she identified at trial as [Petitioner]. He was White with short brown hair. It was a four-door car and she thought the car looked dark green, with a tan interior. The car was very clean. During her trial testimony, the prosecutor showed Ms. B. two photographs of [Petitioner's] blue Alero. Ms. B. testified that it looked like the car in which she was kidnapped. She could not identify the same car in a third photograph because that photograph was taken from the back and Ms. B. had never seen the back of the assailant's car.

The man was wearing a jacket with the word "Kenai" embroidered on it. He was clean-shaved and very clean, as if he had just taken a shower. He picked up a Marlboro cigarette package and took a knife out of it. The knife had a wooden handle with gold-colored metal ends. Telling Ms. B. not to "do anything stupid," the man held the knife against her side and ordered her to pull her pants down. He touched her and put his finger inside her vagina.

The assailant parked the car in the parking lot of a doctor's office near Memorial Hospital. He pulled his pants down, grabbed Ms. B. by the back of her neck, forced her head down and put his penis in her mouth. Then he ordered her to pull her pants all the way down and lower her seat back. He got on top of her and raped her. Next, he returned to the driver's seat and again grabbed her neck and forced her to perform oral sex on him. As she did so, he put his fingers insider her anus. Finally, he went back to her seat and raped her again. He told her repeatedly to say "'[o]h, poppy.'" During the second rape, sweat dripped from the assailant's face and landed on Ms. B.'s face. She did not know whether he ejaculated.

At one point, Ms. B. slipped her cell phone out of her pocket. The assailant saw her doing this and took the phone. He never gave it back.

After the assailant stopped raping Ms. B. the second time, he told her to put her clothes on and said she could leave. She walked away and a few minutes later flagged down a car. She told the driver what happened and the driver called the police.

Ms. B. went to Kern Medical Center and was examined by a sexual assault nurse examiner. The examination included the swabbing of her face for DNA, because of the sweat drops.

4

Darren Wright, a criminalist at the Kern County Crime Laboratory, testified that he prepared DNA profiles based on reference samples of [Petitioner's] saliva and of blood from Ms. M. and Ms. B. His report was given to Kaci Wilson, another criminalist. Wilson testified that she prepared DNA profiles from the swabs taken from the faces of the victims. Each sample had a major contributor and a minor contributor, the major contributor being the victim from whose face the swab was taken. The profile for the minor contributor to the sample taken from Ms. B.'s face matched that of [Petitioner]. The probability of an unknown, unrelated person chosen at random matching that profile was one in 380 million for Caucasians. ([Petitioner] is Caucasian.) The profile for the minor contributor to the sample taken from Ms. M.'s face also matched that of [Petitioner]. The probability of an unknown, unrelated person chosen at random matching that profile was one in 30,000 for Caucasians.

Wilson also prepared a profile from a sample of semen found on the passenger seat of [Petitioner's] car. It matched [Petitioner's] profile. The probability of an unknown, unrelated person chosen at random matching that profile was one in 7.2 quintillion for Caucasians.

Detective William Darbee testified that the police seized [Petitioner's] car on December 27, 2006. It was a dark blue 2001 Oldsmobile Alero with license plate number 5VUA119. Jeffrey Cecil, a crime scene technician with the Bakersfield Police Department, testified that an empty Marlboro cigarette package was found in the car. He also said that, by shining a black light, he found stains that appeared to be semen on the passenger seat, the driver's seat, the rear set, and the headliner above the passenger seat. He cut out a portion of the passenger seat upholstery for testing. Cecil also compared the car's tire treads with photographs of tire tracks photographed at Union Cemetery on October 25, 2006. He opined that they matched. Detective Darbee found a discarded tampon on the ground near the tire tracks. Latent fingerprints were found in the car, but none of them matched either victim.

Bakersfield Police Sergeant Scott Thatcher testified that he searched [Petitioner's] apartment on December 27, 2006. On the couch in the living room he found a "brown, tannish" jacket with the words "Kenai Drilling" embroidered in red on the front. Accordingly to the testimony of [Petitioner's] mother, Kimberly Bennett, [Petitioner] worked in the oil fields, was employed by a firm called Kenai Drilling, and worked on cars as a hobby. Ms. B. identified the jacket in a photo as the jacket worn by her assailant. In a dresser drawer in the bedroom, Sergeant Thatcher found a knife. When shown a photograph of the knife at trial, Ms. M. could not say whether it was the knife her assailant used. Ms. B. did identify the knife in a photograph as the knife used by the rapist.

Sergeant Thatcher also found a pornographic video disc in the apartment. The video was titled "Young, Tight Latinas." Detective Darbee testified that he watched the video and it featured a scene in which a Caucasian man has sex with a Hispanic woman. The woman says "oh, poppy" 12 times during this scene.

Detective Darbee identified some photographs as showing a tattoo on each of [Petitioner's] wrists. He also testified that [Petitioner] had letters tattooed on his thighs.

5

There was a W on his right thigh and a P on his left, so that an observer looking at him from the front, reading from the observer's left to the observer's right, would re "WP."

The victims were questioned about the tattoos. Ms. M. testified that she saw tattoos on the assailant's hands, which she described as "letterings." She thought the tattoos were on the back of the hand, near the thumb, and did not remember whether she saw any tattoos on either side of the assailant's wrists. Kimberly Bennett testified at a pretrial hearing that [Petitioner] had "Kimberly" tattooed on the underside of one wrist and "Stacie" on the underside of the other wrist. Ms. M. also testified that she did not remember whether he had any tattoos on his thighs, although he lowered his pants below his knees. "I never paid attention," she said. Ms. B. also did not recall seeing tattoos on the assailant's thighs when his pants were pulled down. She said she was not looking at his thighs and answered yes when asked whether she was "just trying to block everything out in [her] mind." She did not recall seeing tattoos on her assailant's hands.

[Petitioner] presented an alibi defense for the assault of Ms. B. Kimberly Bennett testified that she drove to a mall with [Petitioner] in her Volkswagen Beetle on December 16, 2006, to pick up a ring. It was a diamond engagement ring for [Petitioner]'s girlfriend, Kari Kirk. They left Kimberly Bennett's house at 4:00 p.m. and drove for 20 to 25 minutes. Leslie Wieser, an employee of Helzberg Diamonds, testified to the authenticity of a sales receipt indicating that a Steve Bennett purchased a diamond engagement ring at 4:28 p.m. on December 16, 2006.

Kimberly Bennett testified that she and [Petitioner] returned to her house at 5:20 p.m. Kimberly's daughter ([Petitioner]'s sister) Stacie Huff and her husband Melvin Huff lived next door. [Petitioner] lived across the street. Kimberly and [Petitioner] went to Stacie and Melvin's house. There they saw Melvin, Kimberly's son Michael Bennett, [Petitioner]'s friend Brittney West, and Kari Kirk's sister Amanda Kirk. Each testified that he or she saw [Petitioner] at the Huffs' house that evening. West testified that she was moving in with the Huffs that day. She left the Huggs' house at about 3:30 p.m. to pick up her belongings. It took about 15 minutes to drive to her old apartment, an hour to load her things, and another 15 minute to drive back, so she was back at the Huffs' about 5:00 p.m. About 15 minutes after that, she saw Kimberly and [Petitioner] drive up next door. [Petitioner] showed West the ring.

Three other witnesses confirmed this account. Melvin Huff, [Petitioner]'s brother Michael Bennett, and Kari Kirk's sister Amanda Kirk, all were helping West move and were present when [Petitioner] arrived with his mother and the ring.

Several witnesses also accounted for [Petitioner]'s whereabouts immediately after he arrived with the ring. Amanda and Michael (who were girlfriend and boyfriend) testified that, after showing everyone the ring, [Petitioner] decided he would go see Kari's father, Chris Kirk, to ask for Kari's hand. Chris's house was adjacent to Kimberly's, and they all walked there through a gate in Kimberly's back fence. Chris said yes and [Petitioner] stayed for dinner. All this happened between 5:00 and 6:00 p.m. Chris, his wife Laura Kirk, and their daughter Tami Kirk, all gave testimony confirming this story.

6

If true, the alibi testimony would account for [Petitioner's] whereabouts at about the same time as the assault of Ms. B. Ms. B. testified that it was 4:00 p.m. when she got off work on December 16, 2006. She waited inside the building "a little bit" until the bus arrived. The ride to her stop took 15 to 20 minutes. She did not know what time it was when she got off the bus or what time it was when the rapist's car drove up. It could have been before 5:00 p.m. and it could have been after. Officer Amy Davis testified that Ms. B. said she had gotten off the bus at about 5:15 p.m. The 911 call placed after the rapists let Ms. B. go was at 5:42 p.m. Officer Davis was dispatched to meet Ms. B. at Memorial Hospital, near where the rapists released her, at 5:43 p.m. [Petitioner] did not present any evidence accounting for his whereabouts when Ms. M. was kidnapped on October 25, 2006.

The prosecutor attempted to discredit the alibi witnesses by trying to show that they conspired to concoct and coordinate their story. He elicited testimony from Chris, Laura, Amanda, and Tami Kirk, and from Kimberly and Michael Bennett, that some of the Bennetts and Kirks had met together after [Petitioner's] arrest to discuss his whereabouts at the time of the second kidnapping.

The prosecutor also questioned Kimberly Bennett about an incident in which, during the trial, the trial judge ejected two spectators from the courtroom. On the first day of testimony, outside the presence of the jury, the prosecutor disclosed that Detective Darbee had been listening to tapes of jail phone calls between [Petitioner] and Kimberly, his mother. In one conversation, the two discussed their intention to have two spectators take notes of the proceedings and describe them to witnesses. The two spectators, Stacie Huff and Alisha Whaley, were present and the court told them they could no longer participate as spectators or witnesses and directed them to leave. Kimberly Bennett later testified that she had been instructed that, as a witness, she was excluded from the courtroom while other witnesses were testifying and she was not permitted to communicate with other witnesses about testimony. She admitted she arranged for the spectators to take notes and tell her what was happening. She conceded that this violated the court's instructions, but denied that that was her intention. In his closing argument, the prosecutor said the jury should not believe the alibi testimony for these reasons, among others.

The jury found [Petitioner] guilty as charged and found all the enhancement allegations true, except that it found the multiple-victim enhancement allegations not true to counts 4 and 7, forcible sexual penetration of [Ms. B.].

(Answer, Ex. A, Opinion at *2-16.)

## III.

## DISCUSSION

### A.     Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

7

or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

**B.     Standard of Review**

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412 (2000).  Habeas relief is also available if the state court's decision "involved an unreasonable application" of clearly established federal law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C. § 2254(d)(1),

8

(d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. at 412.  Therefore, a "specific" legal rule may not be inferred from Supreme Court precedent, merely because such rule might be logical given that precedent.  Rather, the Supreme Court case itself must have "squarely" established that specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1419 (2009).  Moreover, the Supreme Court itself must have applied the specific legal rule to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 737 (2011).  Under § 2254(d)(1), review is limited to the record that was before the state court adjudicated the claim on the merits. Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388, 1398 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991).  However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

9

**C.     Review of Petition**

1.     <u>Exclusion of Third-Party Culpability Evidence</u>

Petitioner contends the trial court erroneously excluded evidence of third-party culpability, specifically, evidence that Petitioner's brother, Allen Bennett, committed the offenses against Ms. B. on December 16, 2006.

In the last reasoned decision, the Court of Appeal denied the claim stating the following:

> On October 8, 2008, before the trial started, [Petitioner] sought the court's leave to present evidence of third-party culpability, specifically, evidence that [Petitioner's] brother Allen Bennett committed the offenses against Erica B. on December 16, 2006. The court conducted a hearing.
>
> Kimberly Bennett testified that the reason she drove [Petitioner] to the jewelry store at 4:00 that afternoon was that [Petitioner] told her Allen had borrowed his car. Teresa Tempel, a friend of Kimberly's who lived across the street from her, testified that she spoke to Kimberly on the phone at about 6:00 in the evening on December 16, 2006. Kimberly told her that [Petitioner] had just picked up the engagement ring for Kari Kirk and had gone to see Chris to ask for permission to marry Kari. After talking on the phone for 5 or 10 minutes, Tempel walked across the street to see Kimberly. While she was crossing the street, she saw Allen drive up in [Petitioner's] blue Alero and get out. The time was between 6:12 and 6:15." She had seen Allen sitting in the driver's seat of [Petitioner's] car many times, but had never seen him driving it before.
>
> Kimberly testified that she looked out the window at about 6:15 or 6:30 p.m. and saw [Petitioner's] car parked at [Petitioner's] house across the street. At about 6:30 p.m., Allen came into Kimberly's house. He acted "like something was wrong" and "could have been stoned" from smoking marijuana. He appeared nervous. She said he was "[j]umping around and wouldn't look at me. Like when I say something to him, he would just bounce off to something else."
>
> Kimberly also testified that Allen and [Petitioner] had both parents in common and, in her opinion, looked alike. Like [Petitioner], Allen had tattoos on his wrists. He had "Stacie" tattooed on one wrist and "Emily" on the other. Allen also had a tattoo on the inside of one forearm, a heart with "mom" on it, in the same spot where [Petitioner] had "a skull or something." Unlike [Petitioner], however, Allen had no tattoos on his thighs. Kimberly further testified that Allen sometimes had the use of [Petitioner's] car.
>
> [Petitioner] left his Kenai Drilling jacket in the car and Allen had access to it. Allen lived in [Petitioner's] house on December 16, 2006.
>
> The prosecutor remarked that Allen's DNA was tested and he was excluded as a contributor to the two samples taken from the victim's faces. Defense counsel agreed that

10

the results indicated that Allen was excluded, but commented that there had been no cross-examination on those results. Defense counsel declined to stipulate that Allen was excluded "to the extent that cross-examination might have shown any problem" with the evidence of the tests that excluded him. The court admitted and considered a booking photo of Allen to determine what he looked like, since he did not appear in court. It observed that [Petitioner] and Allen were about the same height and weight and five years apart in age, but opined that they did not look at all alike.

The court ruled on the issue on October 9, 2008, the day after the hearing. Citing *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*), the court stated that the controlling question was whether there was direct or circumstantial evidence linking Allen to the actual perpetration of the crime. It stated at one point that there was not "any" direct or circumstantial evidence linking Allen to the actual perpetration, and at another point that there was "insufficient" evidence doing so. One point it stressed was that Ms. B. said the car in which she was raped was green, while [Petitioner's] car was blue, the point presumably being that it was possible that [Petitioner] used some other car to commit the offenses against Ms. B. while Allen was driving [Petitioner's] car. It denied [Petitioner's] motion to present evidence of Allen's culpability. Defense counsel pointed out that the prosecution's theory was that [Petitioner] used the same car to commit both offenses. At defense counsel's request, the court stated that the ruling was without prejudice and the issue could be raised again later.

The issue was revisited. The parties discussed the issue with the court in chambers on October 10, 2006, and the court announced that it would review the matter and make a decision. On October 14, 2006, defense counsel told the court he had learned from Kari Kirk that Allen Bennett was the one who purchased the video "Young, Tight Latinas" that had been found in [Petitioner's] apartment, where Allen was also living. Counsel later explained that Kari was actually not the source of this information and that Allen himself would be the witness who could testify to it. The court stated that [Petitioner] could have Allen testify to his ownership of the video after all, but indicated that it would not permit questioning that would contravene its ruling excluding third-party culpability evidence. Counsel decided he would not call Allen because he did not "want there to be a problem with regards to third-party culpability."

The same day, the court said it had reconsidered the matter and come to the same conclusion. It again emphasized the differences between [Petitioner's] car and the car described by Ms. B., concluding that the evidence that Allen was driving [Petitioner's] car at the time of the assault on Ms. B, tended not to implicate Allen but, instead, to show that "Allen had nothing to do with the second rape . . . ." It also mentioned Ms. B.'s positive identification of [Petitioner] and the exclusion of Allen as a contributor to the DNA samples from the victims' faces, among other things.

Defense counsel renewed his motion to introduce the third-party culpability evidence after the defense rested. The court heard argument and took the matter under submission. The next day, it reconfirmed its previous decision, reasoning as follows:

"First of all, let me go through my thought process. [¶] . . . [¶]

11

"Neither victim saw tattoos on the thighs.

"[Defense counsel] argues this points to Allen, as he has no tattoos, while the [Petitioner] does have tattoos on his thigh.

"Both victims testified to the effect they were not looking for thigh tattoos, and, thus, did not see any.

"In this Court's opinion this is highly believable, in light of the fact of what the suspect was putting them through both emotionally and physically.

"They both stated something to the effect that they weren't really paying attention to his thighs. They were trying to handle the situation with what was going on there.

"As a result, the Court finds no evidentiary value as to the tattoo evidence regarding the third-party culpability.

"Number two, there is no evidence of any value that I can see that Allen had anything or any participation in the [Ms. M.] rape.

"Neither the [Petitioner] or brother Allen can provide their whereabouts on this date.

"It does not ID a possible suspect, and it does not link any third party to the commission of the crime.

"Number three, as to the similarities in appearance between the [Petitioner] and [Petitioner's] brother. I have to—I must go with the photograph of the brother closest to the time of the rapes, which has been provided to me. And, again, in my opinion, they do not look similar.

 "Number four, [Ms. M.] identified the blue Alero with chrome wheels as the vehicle. There's a stipulation that that vehicle belonged to the [Petitioner].

"That vehicle has a gray interior.

"[Ms. M.] testified that the perpetrator was dirty. The vehicle was dirty when it was inspected in December.

"We go forward to [Ms. B.] [Ms. B] tells the jury the vehicle is dark green with beige or tan interior. That's also what she told law enforcement.

"She testified the perpetrator was clean and the car was clean; that the perpetrator was—like he had just cleaned up to come out and do that. The car was clean. She said nothing about fancy wheels.

"However, she was showed thumbnail photograph number 160 and 162, which is, in fact, the blue Alero, and she stated that it looked like the car that was used to kidnap her. Not that it was, but it looked like the car.

"However, let the record reflect she was also showed thumbnail photograph number 163, which is the same car, and she could not identify that vehicle as being the vehicle that kidnapped her.

"In [*Hall*, *supra*], 41 Cal.3d 826, the Court went through a number of factors to use in looking at third-party culpability, and the facts in *Hall*, in particular, I want to go through.

"In *Hall*, the third party came forward with information about the murder and provided intimate details that only somebody with facts known about the murder could know.

"In *Hall*, the third party approached law enforcement looking for mitigated punishment on pending cases that that individual had pending.

"And also [i]n *Hall*, the third party attributed his failure to come forward earlier for fear of reprisal by the defendant.

"If you look at the facts here in this case, in People versus Bennett, we have nothing even close to those facts here.

"Evidence of mere opportunity on behalf of Allen, that is, being in possession of the car at the time of the rape, does not raise any reasonable doubt about [Petitioner's] guilt.

"Especially in light of the fact that—[Ms. B.'s] inability to conclusively identify the vehicle.

"I find no direct or circumstantial evidence linking Allen to the crime, and, therefore, the motion is denied.

"And let me add this:  However, over and above that determination under *Hall*, there was devastating evidence of DNA here.

"The prosecution's forensic tests refute the defense theory that Allen was the rapist.

"As a matter of fact, the DNA tests completely exonerate Allen as a suspect in this—these crimes against the victim.

"This only strengthens the *Hall* analysis.  Third third-party evidence in this case is inadmissible.

[Petitioner] argues that the evidence of third-party culpability was admissible under the standard of *Hall*, *supra*, 41 Cal.3d 826, and the court abused its discretion in excluding it.

The People agree, but claim the error is harmless.  As we will explain, the evidence was admissible, but not under the *Hall* standard.  We agree with the People that the error was harmless under any standard.

………………………………………………………………………………………

As will be seen, we conclude the evidence pointing to Allen Bennett is not able to raise a reasonable doubt now, so it was not able to raise a reasonable doubt at the time of the court's ruling. It follows that *Hall* did not require its admission.

In spite of this, it is clear that the evidence was admissible simply because it was relevant to the issue of guilt. Evidence that [Petitioner's] car, which the prosecution claimed (and still claims) was used to commit the offenses against Ms. B. on December 16, 2006, between 5:00 and 5:42 p.m., was not in his possession at that time is relevant to the issue of his guilt. It would have contributed to his alibi defense, quite apart from its tendency to implicate a third party. The evidence presented no risk of undue delay, prejudice or confusion, for it merely tended to show that [Petitioner] did not have possession of an instrumentality used in the offense at the time the prosecution's theory required him to have it. Therefore, the evidence could not have been excluded under Evidence Code section 352.

………………………………………………………………………………………………

There is little doubt that the assaults on Ms. M. and Ms. B. were carried out by a single assailant. Both victims positively identified [Petitioner] and both said pictures of his car showed the car used in the assaults. The assailant used the same modus operandi in both assaults: First, in each instance, he lured or forced a young Hispanic woman, found near a bus stop, into the car. Threatening her with a knife with a gold-colored handle, while still driving, he forced her to lower her pants; then, continuing to drive, he touched her genitals. Both times he next [sic] parked in a secluded place and forced the victim to copulate him orally and raped her, making her call him "poppy." Finally, he stole something from both victims and released them near hospitals.

There also was overwhelming evidence that this single assailant was [Petitioner]. It is undisputed that the car used in the assaults was [Petitioner's] car. The first victim, Ms. M., got part of the license plate number and knew the car was an Alero; the tire tracks found in the cemetery near the discarded tampon matched the tires on [Petitioner's] car. [Petitioner] and the People agree that [Petitioner's] car was also used to commit the offenses against the second victim, Ms. B. The assailant was wearing [Petitioner's] work jacket and told Ms. M. his name was Steven, he worked in the oil fields, and his hobby was cars or planes. [Petitioner's] mother testified that [Petitioner] worked in the oil fields and liked to work on cars. [Petitioner's] knife was used in the attacks. Both victims positively identified [Petitioner] as the assailant. To credit the evidence that Allen was the perpetrator, the jury would have had to believe not just that the victim's mistook [Petitioner] for Allen, but that Allen was actually impersonating [Petitioner].

Most important, the DNA found on Ms. B. matched [Petitioner's] DNA and the odds of a match with a randomly selected, unrelated person were one in 380 million. The odds of a match with a related person—such as the contributor's brother—were presumably greater, but the test results discussed at the pretrial hearing indicated that Allen was excluded as a contributor to the sample. The DNA found on Ms. M. also matched [Petitioner's], and the odds of a match with a randomly selected, unrelated person were one in 30,000. The test results indicated that Allen was excluded as a contributor to that sample as well. Semen

matching [Petitioner's] DNA was found in the seat where the victims were raped. The odds of a match were one in 7.2 quintillion.

The excluded evidence would have been an insignificant counterweight to this overwhelming evidence of [Petitioner's] guilt. At best, the evidence would have combined with the alibi testimony to support the claim that [Petitioner] was doing something else and was not using his car when the second assault took place. The alibi testimony, however, was incomplete, for it did not account for [Petitioner's] whereabouts or separate him from his car when the first assault took place. That testimony also was compromised by the evidence that the alibi witnesses had undertaken to coordinate their testimony before and during trial. The jury found that the alibi testimony was false. Would it have been convinced to reach the opposite conclusion if it had heard Kimberly Bennett and her friend Teresa Tempel testify that they saw Allen drive up at about 6:00 p.m. in [Petitioner's] car, heard that Allen owned the video, known that Allen had tattoos on his wrists and none on his thighs, heard that Allen could have worn the jacket, and seen what Allen looked like? We are confident, beyond a reasonable doubt, that it would not.

[Petitioner] argues that the DNA evidence should not be given great weight because laboratory errors are possible. In fact, evidence was presented that Kaci Wilson, one of the criminalists who testified, once made an error when preparing a DNA profile as part of a quality-control exercise. She placed a tube in the wrong receptacle inside a piece of equipment, with the result that the genetic material deposited in that tube was mislabeled. Wilson caught the mistake and corrected it, and her laboratory instituted a new labeling system to prevent it from happening again.

Wilson also testified about the theoretical possibility of cross-contamination of samples and about the measures taken in her laboratory to prevent it. She tested the semen sample from the car several days before she tested the samples from the victims' face swabs, so there was virtually no possibility of cross-contamination arising from her handling of those samples, since she had changed clothes and showered several times during the intervening days and the equipment is cleaned after each use. The reference sample from [Petitioner] was prepared and profiled by another criminalist, Darren Wright, at a different time, so there was no likelihood that the reference sample could have contaminated the samples taken from the victims. In sum, there is no reason to think the jury would have decided to give dispositive weight to the possibility of laboratory error if it had heard the excluded evidence.

[Petitioner] also contends that it would be erroneous to rely *solely* on the DNA evidence to find the error harmless. We do not rely solely on it. The other evidence against [Petitioner], which we have just summarized, also was powerful. For these reasons, the court's error in excluding the evidence regarding Allen Bennett was harmless beyond a reasonable doubt.

Finally, in a letter submitting after briefing was completed, [Petitioner] discusses two cases he did not discuss before, *McDaniel v. Brown* (2010) __ U.S. __ [130 S.Ct. 665] and *People v. Kiihoa* (1960) 53 Cal.2d 748. Neither of these precedents changes our view of this case.

………………………………………………………………………………

15

(Answer, Ex. A, Opinion at *17-40.)

The Constitution guarantees a criminal defendant the right to present evidence in his defense. See e.g., Holmes v. South Carolina, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clause of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks omitted). However, the right to present a defense is not absolute. Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003). If state law excludes certain evidence there is no violation of the defendant's constitutional right to present a defense unless the law is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308 (1998) (internal quotation marks and citations omitted). Indeed, the Supreme Court has acknowledged that trial courts have discretion to exclude evidence of third-party culpability if such evidence is speculative, remote, or fails to prove or disprove a material fact at issue in trial. Holmes v. South Carolina, 547 U.S. at 327.

Under California law, third party culpability evidence is inadmissible "if it simply affords a possible ground of suspicion against [another] person; rather, it must be coupled with substantial evidence tending to directly connect that person with the actual commission of the offense." Perry v. Rushen, 713 F.2d 1447, 1449 (9th Cir. 1983) (quoting People v. Green, 27 Cal.3d 1, 22 (1980).)

Claims of error under Chapman are subject to harmless-error analysis. If a state court finds that constitutional error was harmless under Chapman, habeas corpus relief is not warranted unless the state court "applied harmless-error review in an objectively unreasonable manner." Mitchell v. Esparza, 540 U.S. 12, 18-19 (2003) (citations omitted). On collateral review of a state court criminal judgment under 28 U.S.C. § 2254, an error is harmless unless it had "a

substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 631 (1993). "When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable." Towery v. Schriro, 641 F.3d 300, 307 (9th Cir. 2010).

In this case, defense counsel's theory was that Petitioner's brother, Allen Bennett, committed the assaults against both victims because he had tattoos on his hands but, unlike Petitioner, did not have any on his thighs, was driving Petitioner's Alero at the time Ms. B was kidnapped and assaulted, had purchased the video found in Petitioner's home, and had access to Petitioner's jacket that was in his vehicle. The California Court of Appeal reasonably concluded that any evidentiary error in excluding evidence that Petitioner's brother, Allen Bennett, may have committed the offense against Ms. B. was harmless because there was overwhelming evidence of Petitioner's guilt irrespective of the excluded third-party culpability evidence.

The defense failed to proffer substantial evidence tending to directly connect Petitioner's brother, Allen Bennett, to the offenses against Ms. A and Ms. B. Rather, there was DNA evidence implicating that Petitioner committed the assaults against both victims which irrefutably corroborated the victims' identification of Petitioner as the perpetrator. In addition, the DNA evidence specifically excluded Allen Bennett as the perpetrator.

Furthermore, both victims picked Petitioner out of a photographic lineup and both identified him at trial. (RT 368-369, 384-385, 461, 472, 697, 706-709, 724-725.) Petitioner used a knife during both assaults, and police discovered a similar knife from Petitioner's apartment. (RT 367-368, 454-455, 741-742, 748-749, 753.) Ms. M. testified that Petitioner wore a dirty khaki and blue jacket, and Ms. B. stated Petitioner wore a brown jacket with the word "Kenai" embroidered on it. (RT 369, 458.) Both victims recalled seeing a package of Marlboro cigarettes

during the assault, and an empty package of Marlboro cigarettes was discovered in Petitioner's car. (RT 368, 455, 683.) Petitioner also told Ms. M. that his name was Steven, he lived in Oildale, worked in the oil fields, and liked to work on cars. (RT 377.) Petitioner's mother testified that Petitioner worked at Kenai oil and he liked to work on cars. (RT 1128.) Both victims testified that Petitioner directed them to say "oh poppy" several times during the assault and a pornographic videotape was recovered from his home in which the phrase "oh poppy" was repeatedly stated. (RT 372-373, 467, 664-665, 750-752.) Given this strong evidence, there is no reasonable likelihood that the evidentiary error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. Therefore, viewing the trial record as a whole, and for the reasons set forth by the California Court of Appeal, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. 28 U.S.C. § 2254(d).

2. Evidentiary Hearing

There is no basis to Petitioner's claim that an evidentiary hearing is warranted. In Cullen v. Pinholster, the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." __ U.S. __; 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review" to determine whether a claim adjudicated by the state court was contrary to or involved an unreasonable application of clearly established federal law. Id. at 1400. Therefore, if the state court adjudicated the claim on the merits, a petitioner must overcome the limitation imposed by § 2254(d)(1) by looking solely to the record that was before the state court. Id. An evidentiary hearing may be granted with respect to a claim adjudicated on the merits in state court where the petitioner satisfies § 2254(d)(1), or where § 2254(d)(1) does not apply, such as where the claim was not adjudicated on the merits in state court. Id. at 1400-1401. Thus, if the state-

court record precludes habeas corpus relief under § 2254(d), there is no basis for an evidentiary hearing. Id. at 1399, 1401.

As noted above, the state court adjudicated Petitioner's claim on the merits. Petitioner has not shown that the state court adjudication of his claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, this Court's review is limited to the record that was before the state court, and Petitioner's request for an evidentiary hearing should be denied.

## IV.

## RECOMMENDATION

Based on the foregoing,

IT IS HEREBY RECOMMENDED that:

1.   The instant petition for writ of habeas corpus be DENIED; and

2.   The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the

//

//

//

1  Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that
2  failure to file objections within the specified time may waive the right to appeal the District
3  Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **April 19, 2013**

UNITED STATES MAGISTRATE JUDGE